Robert W. Dickerson, Jr. (SBN 89367)
E-mail: rdickerson@bwslaw.com
Matthew D. Murphey (SBN 194111)
E-mail: mdmurphey@bwslaw.com
John Yang (SBN 262065)
E-mail: jyang@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Suite 2400
Los Angeles, CA 90071-2953
Tel: 213.236.0600    Fax: 213.236.2700

Attorneys for Plaintiff
HYPERTEXT TECHNOLOGIES, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| HYPERTEXT TECHNOLOGIES, LLC,<br><br>         Plaintiff,<br><br>v.<br><br>COOLPAD TECHNOLOGIES, INC. and DOES 1-10, inclusive,<br><br>         Defendants. | Case No. 8:19-cv-02365-DOC-JDE<br><br>**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge:   Honorable David O. Carter |

For its first amended complaint against Defendants, plaintiff Hypertext Technologies, LLC ("Hypertext" or "Plaintiff") alleges as follows:

1. Plaintiff Hypertext files this first amended complaint against defendant Coolpad Technologies, Inc. ("Coolpad") and the Doe defendants alleging direct and indirect willful infringement of U.S. Patent No. 7,113,801 (the "'801 Patent").

2. The accused products ("Accused Products") include Coolpad's devices that store and execute SMS (Short Message Service) text messaging application(s), for example, the Coolpad *Legacy* smartphone, that receive an SMS text message including an application protocol identifier and URL information, and use the

application protocol identifier and the URL information to receive data from a web server using an application program stored and executed by Coolpad's devices, such as a web browser, where the amount of such received data can significantly surpass the 140 byte size limitation of the SMS text message.

3. A true and correct copy of the Complaint and all exhibits in this matter, as filed December 9, 2019, was sent via Federal Express to Coolpad on December 10, 2019. A true and correct copy of that Letter (without enclosures) is attached as Exhibit A.

4. An email communication from Coolpad referencing the Complaint was received by counsel for Hypertext on December 20, 2019. Therefore, Coolpad had notice of the Complaint (including all its exhibits) and the '801 Patent at least as early as December 20, 2019.

5. Thus, Coolpad was on notice as of that date not only of the '801 Patent but also of the facts necessary to understand and appreciate the manner in which the Accused Products infringe, and how the use of the Accused Products regarding SMS messaging also infringe as shown on in the claim chart attached to the Complaint as an exhibit.

6. Hypertext is informed and believes that notwithstanding the fact that Coolpad has received a copy of the Complaint and its attached claim chart and has thus been put on notice of not only the '801 Patent but also of the facts necessary to understand and appreciate that the '801 Patent is infringed by making, importing, offering for sale, selling and/or using the Accused Products, Coolpad has not taken or initiated any steps to modify the Accused Products to avoid infringement, or any steps to advise the importers, distributors, sellers and users of the Accused Products to cease infringement; nor has Coolpad instructed any of them on how to avoid infringement, even though the modifications necessary to avoid infringement can be quickly and easily implemented, even on Accused Products in the hands of end users.

7. Therefore, every manufacture, importation, offering for sale, sale or use of the Accused Products within the United States is an act of infringement for which Coolpad is liable directly and indirectly.

8. Although each Accused Product may be sold only a limited number of times before making its way into the hands of the ultimate end-user customer ("CoolPad Customer"), the number of times that each Coolpad Customer engages in a use of each Accused Product that constitutes infringement of the '801 Patent is very large.

9. The Pew Research Center has reported that at least 97% of all smartphone owners send text messages regularly. And on average, each person in the United States who uses text messaging sends and receives 94 SMS text messages per day (33,834 text messages per year). *See, e.g.,* https://www.textrequest.com/blog/texting-statistics-answer-questions/ (January 24, 2019).

10. Therefore, for every 100,000 Accused Products in use in the United States today, on average those Accused Products will send and receive approximately 10,000,000 (Ten Million) SMS text messages every day. Of those 10,000,000 daily SMS messages, it is a believed that a significant number of them will include an application protocol identifier and URL information, and use the application protocol identifier and the URL information to receive data from a web server using an application program stored on and executed by the Accused Products, such as a web browser. If even just 3% do so, that would equate to 300,000 individual acts of infringement by a Coolpad Customer every day.

11. As of the date that Coolpad was on notice of the '801 Patent, Coolpad became indirectly liable for each of those acts of infringement as herein alleged in more detail.

///
///

## PLAINTIFF HYPERTEXT AND THE ASSERTED PATENT

12. Plaintiff Hypertext is a limited liability company organized and existing under the laws of the state of Delaware, having its principal place of business in Mission Viejo, California.

13. Hypertext is the owner of all right, title and interest in and to the '801 Patent, entitled "Method For Receiving Data Using SMS And Wireless Internet And System Thereof." A true and correct copy of the '801 Patent is attached as Exhibit B, and incorporated herein by reference.

## DEFENDANT COOLPAD AND THE ACCUSED PRODUCTS

14. Defendant Coolpad is, on information and belief, a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 530 Technology Drive, Irvine, California.

15. There may be other individuals and entities besides Coolpad who have some involvement and liability for the wrongful acts alleged herein. Therefore, as their true names or capacities are at this time unknown to Plaintiff, they are sued herein under the fictitious names Does 1 through 10, inclusive. Plaintiff reserves the right to amend this Complaint as appropriate to specifically identify such Doe defendant(s).

16. Coolpad is and has been directly infringing the '801 Patent by developing, making, having made, using, importing, offering for sale, and/or selling the Accused Products. Coolpad also induces, encourages, urges and instructs others, including importers, distributors, sellers, and users of the Accused Products, to engage in activities that directly infringe the '801 Patent. Doing so makes Coolpad liable for indirect infringement for each direct infringing act of those importers, distributors, sellers, and users of the Accused Products.

17. The Accused Products include, but are not limited to, Coolpad *Legacy* (https://coolpad.us/legacy/) smartphones which include one or more web browsers and one or more SMS messaging applications.

18. Plaintiff is informed and believes that some or all of the Accused Products use the Android operating system.

19. Hypertext reserves the right to amend its infringement allegations after discovery is taken of Coolpad.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

20. Plaintiff Hypertext asserts claims for patent infringement against defendant Coolpad under the patent laws of the United States, including under 35 U.S.C. §§ 271 and 281, *et seq*. The Court has original jurisdiction over the '801 Patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a). Plaintiff Hypertext's principal place of business is in this judicial district.

21. The Court has personal jurisdiction over Coolpad. Coolpad has committed and is committing acts of direct infringement in this district, including currently and in the past using, making, having made, importing, selling and/or offering for sale the Accused Products in this district.

22. Venue is proper in this district under 28 U.S.C. § 1400(b).

23. In addition to having committed and continuing to commit acts of infringement in this district, Coolpad has an established place of business in this district at 530 Technology Drive, Irvine, California (s*ee* Exhibit C attached, which is a true and correct copy of the Statement of Information for Coolpad that was "FILED" with the California Secretary of State on September 17, 2019, and which lists 530 Technology Drive, Irvine, California address as Coolpad's "street address of principal place of business in California").

24. The Coolpad location listed above: (i) is a physical place in the Central District of California (consisting of a building or a part of a building at which Coolpad-related business is conducted); (ii) operates Coolpad-related business in a regular, steady, uniform, orderly, settled, fixed, and permanent manner; and (iii) is owned or leased by Coolpad, and has been ratified by Coolpad as a place of business ("Coolpad Office").

25. This Coolpad Office is therefore a regular and established place of business owned and operated by Coolpad for purposes of §1400(b).

26. As a result, Coolpad is "present" in this judicial district, and can be sued in this judicial district.

27. This judicial district is an appropriate and convenient forum for this patent infringement suit against Coolpad.

28. As shown in Coolpad's Statement of Information (Exhibit C), its Agent for Service of Process is listed as Ms. Lily Chen, 5850 Oberlin Drive #240, San Diego, CA 92121, and Coolpad may be served there, as well as at its office at 530 Technology Drive, Irvine, California, among other locations.

## CLAIM FOR RELIEF
## FOR PATENT INFRINGEMENT

29. Hypertext incorporates by reference each of the allegations in the foregoing paragraphs and further alleges as follows.

30. On September 26, 2006, the United States Patent and Trademark Office duly issued the '801 Patent, which has an effective filing date of February 6, 2001 ("Effective Filing Date") based upon a claim of priority to corresponding parent patent application filed on that date in the Republic of Korea. ['801 Patent, Title Page, Paragraph (30)]. The technology disclosed and claimed in the parent patent application and in the '801 Patent was invented by engineers at KTFreetel Co., Ltd. ("KTFreetel"), a (South) Korean company.

31. KTFreetel was, both before and after the Effective Filing Date, a global leader in research and technology relating to telecommunications, including cellular communications and messaging. The parent patent application and the '801 Patent were initially assigned to KTFreetel. KTFreetel was later merged into Korea Telecom, which was and is the largest telecommunications company in (South) Korea.

///

32. All maintenance fees on the '801 Patent have been paid timely and fully to the United States Patent and Trademark Office (as shown on Exhibit D, attached).

33. The chain of title for the '801 Patent as listed in the United States Patent and Trademark Office database is attached as Exhibit E. To the best of Hypertext's knowledge, information and belief, this chain of title as to its predecessors-in-interest is complete and accurate, such that Hypertext is now the legal owner of all right, title and interest in and to the '801 Patent, including the right to sue for and collect damages for past, present and future infringement of the '801 Patent.

34. To the best of Hypertext's knowledge, information and belief, Hypertext is not aware of any prior owner or any licensee of the '801 Patent that has ever offered for sale or sold a product that included the patented technology, such that there has never existed a requirement for "marking" of the '801 Patent's number on any product in accordance with the Patent Laws, and there is no requirement to "mark" as to a patented "process" in any event. *See, generally,* 35 U.S.C. § 287.

35. Therefore, neither actual nor constructive notice by Coolpad of the '801 Patent is required in order for Coolpad to be liable to Hypertext for direct infringement damages extending back at least six years before the filing date of the original complaint in this matter.

36. Each claim of the '801 Patent is directed to and is rooted in computer technology, improves the operation of the Accused Products, and is not directed to merely an abstract idea. Each claim of the '801 Patent does not merely recite and is not limited to a previously well known, understood, and used system or process that has merely been replicated on a computer.

37. There is no "pen and paper" equivalent to the patented technology.
///

38. The claimed inventions in the '801 Patent improved the SMS technology for communication of SMS text messages between computing devices, such as the Accused Products.

39. The acronym SMS stands for Short Message Service. The adjective "Short" refers to the noun "Message" and accurately describes the small or "short" size of a message that can be sent via SMS. Indeed, as of the Effective Filing Date, each SMS message was limited to 140 bytes of data. That is still the case today.

40. This small maximum byte size of an SMS message was a significant problem and drawback to the widespread use of SMS messages.

41. Because of this restricted size, the use of SMS messaging technology was similarly restricted, being used as of the Effective Filing Date mainly for providing small amounts of information, such as weather information, stock pricing information, and other similarly truncated data. ['801 Patent, Col. 1, ln. 39 - 42].

42. Computer files that are routinely transmitted today using personal computing devices, such as an image file, a video file and the like, could not have been sent using the SMS technology as of the Effective Filing Date. ['801 Patent, Col. 1, ln. 43-46]. The SMS technology then was too limited for widespread use with a wide array of information and data, and could not be used to transmit anything other than "short messages" as of the Effective Filing Date.

43. That is no longer the case. It has been estimated that by the end of 2010, the SMS technology was the most widely used data communications technology, with an estimated 3.5 billion users, or about 80% of all mobile subscribers. *See* https://en.wikipedia.org/wiki/SMS, citing to Ahonen, Tomi T. (January 13, 2011) *Time to Confirm Some Mobile User Numbers: SMS, MMS, Mobile Internet, M-News*, Communities Dominate Brands.

44. In fact, one report from 2012 stated that even then there were more people in the world who send and receive SMS text messages than those who have electricity in their homes. *See* https://www.ringcentral.com/blog/wp-

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

8:19-CV-02365-DOC-JDE
FIRST AMENDED COMPLAINT

content/uploads/2012/12/SMS_ Infographic2.jpeg

45. Today, much of the use of the SMS technology is in mobile marketing, a type of direct marketing. Indeed, according to one market research report, as of 2014 the global SMS messaging business was estimated to be worth over $100 billion, accounting for almost 50% of all revenue generated by mobile marketing. *Id.,* citing to Portio Research, *Mobile Messaging Futures 2014-2018*; *see also* https://www.businesswire.com/news/home/20150212006013/en/Research-Markets-Mobile-Messaging-Futures-2014-2018-Key.

46. A vitally important feature of the mobile marketing using the SMS technology is the ability to include within the SMS text message a URL link, which a recipient of the SMS text message can simply "click on" or "tap on" to be transported to that URL website ("embedded SMS clickable links").

47. These embedded SMS clickable links are an important factor in what has made SMS such a widely used technology today, and particularly with respect to mobile marketing, where the marketeer can include an embedded SMS clickable link in the SMS text message, and the potential customer recipient merely has to click or tap on that link to be "transported" to the marketeer's website.

48. It is as if the entirety of the marketeer's website (or any other website of the marketeer's choosing) is set forth in the SMS text message. This feature greatly enhanced the usability and value of SMS technology.

49. Being able to circumvent the small-size restriction on the maximum number of bytes (and in turn, characters) that can be included in an SMS message opened the door to modern SMS mobile marketing.

50. But the embedded SMS clickable links are not just useful in mobile marketing. Embedded SMS clickable links can be used to "transport" the SMS text message recipient to literally anything that is accessible via the Internet, such as a photo album from an important event (such as wedding or anniversary party), music, videos, restaurant locations, menus and reviews, store locations and hours of

1  operation, hospital locations, etc.  The list is almost if not virtually endless.

2  51. This advance in the art of SMS technology was revolutionary.  It has
3  allowed the use of SMS technology to expand way beyond its 140-byte limitations.
4  Without it, the use of SMS messaging would still be limited to things like the
5  weather and stock price reports, "how-are-you" and "where-are-you" messages
6  between friends and family members, and other short messages.

7  52. The patented technology in the '801 Patent has been commercially
8  successful within the United States and globally.

9  53. As of the Effective Filing Date, the patented technology in the '801
10 Patent was novel and nonobvious to a person of ordinary skill in the art.

11 54. The patented technology in the '801 Patent has been incorporated in
12 most if not all SMS messaging applications currently available on smartphones,
13 tablet computers, and similar products today and over the prior six years.

14 55. The infringed claims of the '801 Patent are directed, among other
15 things, to an improvement in the implementation and use of SMS messaging
16 systems that allow for embedding URL information in SMS messages that has been
17 a key factor in making use of SMS messages very popular.  Figure 2 of the
18 '801Patent, reproduced here, is illustrative:



56. The '801 Patent describes this Figure, in part, as follows:

> "FIG. 2 is a schematic illustration of a user terminal receiving data by using SMS (Short Message Service) and wireless Internet in accordance with one preferred embodiment of the present invention." [Col. 3, ln. 14-18].

> "Referring to FIG. 2, the user terminal 410 receives short messages transmitted from the SMS server 110. The user terminal 410 may comprise a receiver/transmitter 420 for transmitting a URL connecting request, a controller 435 for connecting the communication channel based on application protocols comprised in the received short messages, and storing device 480 for storing program which may be used for executing the controller 435 and connecting the communication channel. [Col. 4, ln. 35-43].

57. Also, the '801 Patent states that Figure 4 of the '801 Patent "is a flow chart flowchart illustrating an automatically connecting process to a web site by using the URL in correspondence with the application protocol comprised in the short message received by the data receiving system in accordance with one preferred embodiment of the present invention." [Col. 3, ln. 23-27].

58. These and other Figures in the '801 Patent are further discussed and described in the '801 Patent. [*See also*, *e.g.,* Col. 5. ln. 57 to Col. 6, ln. 58].

59. The Figures and the discussion and description of them in the '801 Patent fully describe the solution to the byte size limitation in SMS text messaging, and how to implement that solution, to a person of ordinary skill in the art as of the Effective Filing Date.

60. The claimed technology in the '801 Patent eloquently solved the problem of the number-of-bytes limitation in SMS text messaging that had theretofore limited its use to short weather reports and the like.

61. The building blocks in the '801 Patent are clearly integrated into something more than an "abstract idea."

62. The claimed inventions here are patent eligible for reasons similar to why the claimed invention in *Enfish, LLC v. Microsoft Corp*. 822 F.3d 1327, 1336 (Fed. Cir. 2016) was deemed patent eligible. The claims of the '801 Patent are directed to a particular improvement to a "device" (in *Enfish*, a computer, here, a computing device, such as a smartphone, with SMS text messaging capability). The claimed invention here is also patent eligible for reasons similar to those relied upon in *Visual Memory LLC v. NVIDIA Corp*, 867 F.3d 1253. 1262 (Fed. Cir. 2017), where claims directed to an improved computer system that provided flexibility in use which was not present in the prior art were held patent eligible.

63. The claimed inventions here are patent eligible also for reasons similar to those relied upon in *Core Wireless Licensing S.A.R.L v. LG Electronics, Inc. et. al*, 880 F.3d 1356, 1362 (Fed. Cir. 2018), where the Federal Circuit found patent eligible an asserted claim that required "an application summary that can be reached directly from the menu" and "wherein each of the data in the list being selectable to launch the respective application and enable the selected data to be seen within the respective application." Here, according to the claimed technology of the '801 Patent, the URL "can be reached directly from" the received SMS text message.

64. Each claim of the '801 Patent recites numerous additional unconventional technical steps, each of which is independently sufficient to confer patent-eligibility.

## COOLPAD'S INFRINGEMENT OF THE '801 PATENT

65. Coolpad has infringed and continues to infringe claims of the '801 Patent by making, having made, importing, using, offering to sell, and selling the Accused Products that infringe one or more claims of the '801 Patent, including independent claims 1 and 5. Coolpad's infringement is both direct and indirect, as

it has induced and contributed to the infringement by others after having received notice of the '801 Patent.

66.  An example of the way in which the Accused Products infringe claim 1 of the '801 Patent is provided in the claim chart shown in Exhibit F attached hereto, which is incorporated herein by reference as if fully set forth.

67.  Importers, distributors, sellers and users of the Accused Products also infringe the '801 Patent, and are induced to do so by Coolpad.  Coolpad also contributes to that infringement.

68.  Coolpad has taken, and on information and belief will continue to take, action during the time the '801 Patent is in force intending to cause the acts by those importers, distributors, sellers and users of the Accused Products that infringe the '801 Patent.  Coolpad actively induces, encourages and urges users of the Accused Products to utilize SMS messaging applications and to include an application protocol identifier and URL information in their SMS messages, knowing full well that those users are going to include an application protocol identifier and URL information in their SMS messages, and thus infringe.

69.  There is no substantial non-infringing use of the infringing messaging applications of the Accused Products given the limited byte size of an SMS message on the one hand, which, as discussed in the '801 Patent, severely limited the use and usefulness of SMS text messaging before the advent of the claimed technology of the '801 Patent, and continues to limit the use of SMS text messaging without an application protocol identifier and URL information, compared to the massive amount of use and exchange of data in SMS messaging, using the technology described and claimed in the '801 Patent on the other hand. *See* Paragraphs 39 to 52 above.

70.  Upon information and belief, after Coolpad's receipt of notice of the '801 Patent and the referenced claim chart, Coolpad's importers, distributors, sellers and/or users of the Accused Products continued and continue to infringe, and

1  Coolpad does not require and has not required its importers, distributors, sellers and
2  users of the Accused Products immediately to stop that infringement.

3       71.    Thus, Coolpad at that time became liable for indirect infringement
4  based upon its past and continuing enabling, urging, inducing and contributing to
5  that infringement.

6       72.    Coolpad has been able, since receiving notice of the '801 Patent, to
7  cease infringement, immediately and easily, and can immediately cause its
8  importers, distributors, sellers and users of the Accused Product to cease
9  infringement, by disabling its messaging applications on the Accused Products, or
10 disabling the ability of those messaging applications to recognize and execute any
11 function based on application protocol identifier and URL information in the SMS
12 messages received on the Accused Products.  Coolpad can easily and quickly do
13 this by sending software updates to all Accused Products currently in inventory or
14 in use, and disabling those functions in Accused Products manufactured and/or sold
15 in the future.  Coolpad, however, has not done so.

16      73.    Coolpad may have had either actual or constructive knowledge and/or
17 notice of, or was willfully blind to, the '801 Patent before having received a copy of
18 the original complaint in this matter.  Discovery in this matter may disclose that
19 Coolpad had notice of the '801 Patent prior to that date.  Hypertext reserves the
20 right to amend its complaint in this regard after taking discovery of Coolpad.  As
21 alleged above, Coolpad had knowledge of the '801 Patent no later than December
22 20, 2019.

23      74.    Since receiving notice of the '801 Patent and failing to cease
24 infringement, Coolpad's infringement has been intentional.  Given the ease with
25 which Coolpad could immediately cease infringement, and could instruct its
26 importers, distributors, sellers and users of the Accused Products to cease
27 infringing, Coolpad's blatant disregard for its own infringement of the '801 Patent
28 and the infringement of its importers, distributors, sellers and users of the Accused

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

8:19-CV-02365-DOC-JDE
FIRST AMENDED COMPLAINT

Products makes this an exceptional case.

75. Hypertext did not allege indirect or willful infringement in the original complaint filed in this matter because at the time filed, Hypertext did not have sufficient knowledge, information or belief that Coolpad had notice of the '801 Patent. As alleged above, Coolpad received notice of the '801 Patent no later than December 20, 2019. Therefore, Coolpad had notice of the '801 Patent prior to the filing of this First Amended Complaint.

76. There is a split among various districts as to whether a defendant's notice of infringement in the first-filed, original complaint is sufficient to support an allegation of induced and willful infringement that is set forth in that original complaint. For example, the court in *Kaufman v. Microsoft* Corporation, 16-cv-2880 (AKH)(S.D.N.Y.) held that it was not sufficient, thus granting summary judgment dismissing the claim for willful infringement. [*Id.*, January 22, 2020, Dkt. 166).

77. Other courts have held otherwise; for example, *Finjin, Innc. v ESET, LLC*, 3:17-cv-0183-CAV (BGS), 2017 WL 1063475 (S.D. Cal., March 21, 2017, Dkt. 105; *Huawei Technologies Co. Ltd. v T-Mobile US, Inc.*, 2:16-CV-00052 – JRG-RSP (February 21, 2017, Dkt. 147); and *Bascom Research LLC v Facebook, Inc.*, 3:12-cv-06293-SI; 2013 WL 968210 (N.D. Cal. March 12, 2013, Dkt. 71).

78. In the *Kaufman* case, plaintiff had alleged willful infringement in the original complaint (April 16, 2016, Dkt. 1). Plaintiff in *Kaufman* did not file an amended complaint, and the issue of whether the claim for willful infringement should be dismissed related entirely to the claim as alleged in the first-filed, original complaint, and not in an amended complaint. Also, there were no allegations in *Kaufman* relating to the ease or difficulty with which defendant could stop infringing, and stop infringement by its importers, distributors, sellers and users.

79. Here, Hypertext is asserting induced and willful infringement in this First Amended Complaint based upon Coolpad's notice of the '801 Patent at least

as early as alleged above.

80. More than enough time has elapsed since Coolpad received notice of the '801 Patent (and the detailed claim chart showing that the Accused Products infringe) for it to have taken or initiated steps to stop infringing itself, and to stop infringement by its importers, distributors, sellers and users of the Accused Products.

81. Coolpad can quickly and easily avoid its ongoing direct infringement of the '801 Patent.

82. Coolpad can quickly and easily stop the ongoing direct infringement of the '801 Patent by the importers of the Accused Products.

83. Coolpad can quickly and easily stop the ongoing direct infringement of the '801 Patent by the distributors of the Accused Products.

84. Coolpad can quickly and easily stop the ongoing direct infringement of the '801 Patent by the sellers of the Accused Products.

85. Coolpad can quickly and easily stop the ongoing direct infringement of the '801 Patent by the users of the Accused Products.

86. On information and belief, Coolpad has taken or initiated no steps to stop its own infringement of the '801 Patent.

87. On information and belief, Coolpad has taken or initiated no steps to stop infringement of the '801 Patent by any of the importers, distributors, sellers and users of the Accused Products.

88. Prior to the filing of this First Amended Complaint, Coolpad has had knowledge and notice of the '801 Patent, and has received and reviewed the first-filed original complaint and the infringement claim chart attached thereto.

89. Notwithstanding that notice and knowledge, Coolpad has still not taken or initiated any steps to stop directly infringing or to stop contributing to and inducing infringement of the '801 Patent by the importers, distributors, sellers and users of the Accused Products.

90. Therefore, Coolpad continues to directly infringe the '801 Patent, and to contribute to and induce the direct infringement of the '801 Patent by the importers, distributors, sellers and users of the Accused Products.

91. Therefore, Coolpad is liable for indirect and willful infringement for all infringing activity after it received notice of the '801 Patent, which occurred no later than December 20, 2019.

92. Whether Coolpad received notice of the '801 Patent before the first-filed original complaint was filed, or based upon the first-filed complaint, is a difference without justifiable or reasonable legal significance under the circumstances of this case.

93. Hypertext has been damaged by Coolpad's infringement of the '801 Patent and is entitled to reasonable royalty damages and enhanced damages due to Coolpad's willful direct and indirect infringement.

## PRAYER FOR RELIEF

Plaintiff Hypertext prays for the following relief:

A. A judgment in favor of Hypertext that Coolpad has directly infringed the '801 Patent and that the '801 Patent is not invalid, is enforceable, and is patent-eligible;

B. A judgment that Coolpad is liable for indirect infringement of the '801 Patent based upon it having induced and/or contributed to the infringement of the '801 Patent by others.

C. A judgment that Coolpad's direct and indirect infringement have been willful, justifying the award of enhanced damages.

D. A judgment and order requiring Coolpad to pay Hypertext compensatory damages, costs, expenses, and pre- and post-judgment interest for its infringement of the '801 Patent, as provided under 35 U.S.C. §284;

///

///

1     E.     A judgment that sets a reasonable royalty rate and licensing terms for
2 Coolpad's ongoing post-judgment infringement if Coolpad does not cease such
3 infringement, or in the alternative, imposes a permanent injunction against further
4 infringement by Coolpad of the '801 Patent; and
5     F.     Any and all other relief to which Hypertext may be entitled.

6 Dated: January 30, 2020          Respectfully Submitted,

7                                  BURKE, WILLIAMS & SORENSEN, LLP
                                   Robert W. Dickerson, Jr.
8                                  Matthew D. Murphey
                                   John Yang
9

10
                                   By: */s/ Robert W. Dickerson, Jr.*
11                                       Robert W. Dickerson, Jr.

12                                 Attorneys for Plaintiff
                                   HYPERTEXT TECHNOLOGIES, LLC
13

14

15                         **DEMAND FOR JURY TRIAL**

16     Plaintiff Hypertext hereby demands trial by jury of all issues which are so
17 triable in this action and on this complaint.

18 Dated: January 30, 2020          Respectfully Submitted,

19                                 BURKE, WILLIAMS & SORENSEN, LLP
                                   Robert W. Dickerson, Jr.
20                                 Matthew D. Murphey
                                   John Yang
21

22
                                   By: */s/ Robert W. Dickerson, Jr.*
23                                       Robert W. Dickerson, Jr.

24                                 Attorneys for Plaintiff
                                   HYPERTEXT TECHNOLOGIES, LLC
25

26

27 LA #4812-2534-8531 v1

28